# EXHIBIT 1

FILED 1st JUDICIAL DISTRICT COURT
Santa Fe County
6/4/2026 9:27 AM
KATHLEEN VIGIL CLERK OF THE COURT
Bryanna A Collazo

**STATE OF NEW MEXICO**
**FIRST JUDICIAL DISTRICT COURT**
**COUNTY OF SANTA FE**

**STATE OF NEW MEXICO, EX REL.,**
**RAÚL TORREZ, ATTORNEY GENERAL,**

          **Plaintiff,**

      **vs.**

**KALSHI, INC. and KALSHIEX LLC,**
**a Delaware Limited Liability Company,**

          **Defendants.**

Case assigned to Wilson, Matthew Justin

**No.** D-101-CV-2026-01567

## COMPLAINT

### I.    INTRODUCTION

1. Until recently, Defendants Kalshi, Inc. and KalshiEX, LLC (together, "Defendants" or "Kalshi") have promoted Kalshi as an online sports betting platform through marketing taglines that have included, "The First Nationwide Legal Sports Betting Platform" and "Sports Betting Legal in All 50 States on Kalshi."[1]

2. Indeed, Kalshi plays the same role as a traditional sportsbook who offers sports betting by facilitating bets (i.e., accepting and holding funds from bettors, and paying out winnings) and retaining a portion of each bet as payment for its services.

3. To ensure that players can always make a bet about an occurrence happening or not happening just as a sportsbook would (e.g., for or against a Denver Broncos win), Kalshi, through a subsidiary, steps in and makes the opposing wager. In other words, if someone places a "no" bet

---

[1] *See* Dustin Gouker, *Ten Times Kalshi Said People Could Bet on Things*, Event Horizon (Apr. 3, 2024), https://perma.cc/472K-U54F.

but no player has placed a corresponding "yes" bet, before the sporting event, Kalshi will enter the "yes" bet on the digital platform.

4.      Despite looking like a sportsbook, acting like a sportsbook, and proverbially quacking like a sportsbook, neither Kalshi nor any of its subsidiaries have sought licensure from New Mexico's Gaming Control Board or otherwise abided by the State's laws governing gambling and gaming within its borders.

5.      Against a backdrop of mounting litigation and regulatory challenges, Kalshi has dropped references to sports betting from its advertising and has instead leaned full throttle into its self-created brand as a "prediction market" offering individuals the ability to purchase "event contracts."[2]

6.      Despite this marketing maneuver, Kalshi continues to operate as a digital platform for sports betting and continues to operate unlawfully within New Mexico.

7.      Through Kalshi's digital platform accessible via an internet browser or mobile device app, New Mexican residents—including 18-to-20 year-olds—are able to bet on thousands of sporting events every day, like whether the Denver Broncos will win their football game on a Sunday, or which basketball team will win the ongoing NBA Finals, or which player will score the most goals at the upcoming FIFA World Cup, or combinations of sports bets like those.

8.      Exercising its traditional police powers through statutory prohibitions, agency regulation, and official statements of public policy, New Mexico has tightly regulated gambling and gaming within the State for decades. *Schnoor v. Griffin*, 1968-NMSC-067, ¶ 27, 79 N.M. 86 ("Except in very limited circumstances, the public policy of this state is to restrain and discourage

---

[2] *See* Kalshi, *What is a Prediction Market?*, Kalshi News (Aug. 4, 2022), https://perma.cc/QZ99-6ZYX.

gambling."); *Ross v. State Racing Comm'n*, 1958-NMSC-117, ¶¶ 10-11, 64 N.M. 478 ("[T]he declared prohibition against gambling in any manner or form" is "long a part of the existing law of this state" and "a matter of public policy."); *Srader v. Verant*, 1998-NMSC-025, ¶ 16, 125 N.M. 521 ("firmly assert[ing]" the State's authority to exercise its exclusive police power over gaming activities within its jurisdiction).

9. New Mexico's Criminal Code ("Criminal Code"), NMSA 1978, Sections 30-19-1 to -15, criminalizes unauthorized gambling and related activities.

10. Through the Gaming Control Act ("GCA" or "Act"), NMSA 1978, Sections 60-2E-1 to -62, the Legislature has authorized only limited forms of gaming—but only if compliant with a robust regulatory framework.

11. And New Mexico law does not allow online betting, or gaming in any fashion by individuals under the age of 21.

12. By offering unlicensed online sports betting—including to underage players—Kalshi violates numerous provisions of New Mexico's Criminal Code and Gaming Control Act. In doing so, Kalshi threatens the health, safety, and welfare of New Mexico residents, and flouts the State's sovereign authority.

13. Attorney General Raúl Torrez brings this civil enforcement action on behalf of the State of New Mexico to enjoin Kalshi's unlawful activity and enforce New Mexico's traditional police powers to regulate gambling to protect the public's health, safety, morals, and general welfare.

## II. PARTIES, JURISDICTION, AND VENUE

14. This action is brought by the State of New Mexico ("Plaintiff") in its sovereign capacity by and through Attorney General Raúl Torrez. The Attorney General acts pursuant to his

authority under, *inter alia*, NMSA 1978, Section 8-5-2 (1933, as amended through 2025); the New Mexico Criminal Code, NMSA 1978, Sections 30-19-1 to -15 (1953, as amended through 2002); and the New Mexico Gaming Control Act, NMSA 1978, Sections 60-2E-1 to -62 (1997, as amended through 2023).

15.     Section 60-2E-48 of the GCA authorizes the Attorney General, at the request of the New Mexico Gaming Control Board ("GCB" or "Board"), to institute a civil action in any court of New Mexico to enjoin violations of any prohibitory provision of the GCA.

16.     Section 30-19-8 establishes any gambling device or gambling location not permitted by the GCA as a per se public nuisance and authorizes the Attorney General to seek injunctive relief to abate such public nuisance.

17.     Section 30-8-8(B) creates an independent civil cause of action that may be brought by any public officer, which includes the Attorney General, to enjoin and abate a public nuisance.

18.     Defendant Kalshi, Inc. is a Delaware corporation having its principal place of business at 416 W 13th Street, Room 207, New York, New York, 10014. Kalshi, Inc. is the parent company of Defendant KalshiEX, LLC.

19.     Defendant KalshiEX, LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 594 Broadway, Suite 407, New York, New York, 10012. KalshiEX, LLC is a wholly owned subsidiary of Defendant Kalshi, Inc.

20.     This Court has personal jurisdiction over Defendants because Defendants do business in New Mexico and have the necessary minimum contacts with New Mexico to constitutionally permit the Court to exercise jurisdiction within the contemplation of the New Mexico "long arm" statute, NMSA 1978, § 38-1-16 (1971, as amended through 2025).

21.    Specifically, Defendants have engaged in substantial business contacts within New Mexico through Defendants' advertising and offering of their digital platform in this State and by actively accepting sports-related bets from individuals residing in New Mexico. Defendants' use of its platform to accept and profit from bets placed within New Mexico is the basis of the illicit activities alleged in this Complaint.

22.    The State brings this action exclusively under the law of the State of New Mexico. No federal claims are being asserted, and to the extent that any claim or factual assertion set forth herein may be construed to have stated any claim for relief arising under federal law, such claim is expressly disavowed and disclaimed by the State.

## III.    FACTUAL ALLEGATIONS

23.    Kalshi was founded in 2018 by Tarek Mansour and Luana Lopes Lara as a web-based platform.

24.    Its founders described the platform as providing individuals the ability to participate in a "prediction market" "where participants buy and sell contracts based on the projected outcomes of specific events."[3]

25.    Until recently, Kalshi also described its platform as offering individuals the ability to "bet on" real world events.[4] For example, in 2022, Kalshi described its prediction market platform as "compil[ing] the collective opinions of participants to set probabilities and pricing for the contract. Each trader's _**bet**_ helps shape the market consensus, which is reflected in the contract

---

[3] Kalshi, *What is a Prediction Market?*, Kalshi News (Aug. 4, 2022), https://perma.cc/QZ99-6ZYX.
[4] *See* Dustin Gouker, *Ten Times Kalshi Said People Could Bet on Things*, Event Horizon (Apr. 3, 2024), https://perma.cc/472K-U54F.

5

prices. Contract prices fluctuate in real time, offering up-to-date insights into public opinions and emerging trends." (emphasis added).[5]

26.     Initially, Kalshi offered betting on a limited number of topics including commodity-related economic events such the rates of inflation, unemployment, and the Consumer Price Index.

27.     In late 2024, Kalshi expanded its offerings to include betting on political and popular culture events, allowing users to bet on the outcomes of everything from elections to awards shows.

### A.      Kalshi Begins Offering Traditional Sports Betting, Branded as "Event Contracts"

28.     On January 23, 2025, Kalshi began offering sports betting on its platform. As of May 13, 2026, sports-related bets accounted for approximately 87% of the bets on Kalshi's platform nationwide.[6]

29.     Sports betting is a popular form of gambling where individuals wager money on the outcome of a sporting event (i.e., who wins) or specific facets, such as the total points scored or a player's performance. Sports betting can take several different forms, with some of the most common being moneyline bets (a straightforward win or lose bet), point spread bets (a wager based on the margin of victory), over/under bets (a wager based on total number of points), prop bets (event-specific bets such as how many touchdowns a football player will score or how many penalties the referees will impose), and parley bets (multiple bets combined into a single wager, with a payout contingent on each individual bet winning).

---

[5] Kalshi, *What is a Prediction Market?*, Kalshi News (Aug. 4, 2022), https://perma.cc/QZ99-6ZYX.
[6] Dustin Gouker, *Is Sports Now Only 70% Of Kalshi's Volume? Not Really,* Event Horizon (May 13, 2026), https://perma.cc/M7X3-W6XC.

30.     Sports betting traditionally occurs through a bookmaker, or sportsbook, which accepts bets from individual bettors and generates odds – representations of the likelihood of an event occurring – with the goal "to attract equal action on both sides of a betting line."[7] Sportsbooks use odds to calculate the potential payout of a bet, indicate the degree of risk involved in a particular bet, and ultimately to set the commission the sportsbook charges individuals for each bet.

31.     The odds set by a sportsbook can change at any time in a practice referred to as "line movement." Line movement occurs due to a variety of factors, including changes in player availability, changes in weather conditions, or changes in the overall betting market like a significant amount of money wagered on one side of a bet.[8] Line movement allows sportsbooks to manage their risk by adjusting the odds to encourage bettors to wager on the opposite side, helping the sportsbook maintain even exposure to both outcomes.

32.     As described in greater detail in paragraphs 47-62 below, Kalshi operates as the sportsbook when it offers players the opportunity to engage in sports betting through its digital platform, even though it describes its offering as the ability to purchase "event contracts."

33.     As described by Kalshi, these so-called contracts predict the outcome of various real-world events, with odds (what Kalshi calls the prices of each such event contract) fluctuating based on the positions taken by other users.[9]

---

[7] Aaron Feld, *Gambling on Sports Data: Protecting Leagues' High-Level Data from Sportsbooks*, 2020 U. Ill. L. Rev. 341, 349 (2020), https://perma.cc/L9FF-VFPN.

[8] James Bisson, *How to Read Odds: Payouts, Types, Examples,* Sportsbook Review (Feb. 11, 2026) https://perma.cc/M2CJ-7MN8.

[9] *See* Kalshi, *What is Kalshi*? (March 17, 2026), https://perma.cc/7VXH-XBYC;  Kalshi, *How are Prices Determined?* (March 10, 2026), https://perma.cc/5353-2ZNX.

34.    However, once it began offering sports-related bets, Kalshi affirmatively advertised its platform as providing legal "sports betting" in all 50 states, as reflected in the following screenshots from its official social media account and digital advertisements:






35.    Today, Kalshi "offer[s] contracts on game outcomes across football, basketball, baseball, golf, MMA, tennis, and more" and claims that "[s]ports markets have become one of [its] fastest-growing segments[.]"[10]

---

[10]  Julian Zhang, *What Is Kalshi? A Beginner's Guide,* Kalshi News (Feb. 9, 2026), https://perma.cc/3BPA-Q7H7.

36.     The event contracts offered by Kalshi are binary in nature. Individuals can take a "Yes" or "No" position on whether a specified sports-related event will occur (e.g., whether a team will win or lose, or whether the teams will collectively score more than 50 points).

37.     All event contracts on the platform are priced between $0.01 and $0.99 depending on the total number of contracts that have been placed on an event at any given time.

38.     For example, if Kalshi offered an event contract on "Will the Denver Broncos beat the Las Vegas Raiders on November 6, 2025?" a person could purchase the "yes" side of an event contract for $0.30, or the "no" side of that event contract for $0.70. However, as more "yes" event contracts are purchased, the price of a "yes" event contract will increase, say to $0.60, and the price of a "no" event contract will decrease accordingly, say to $0.40.

39.     There is no limit to the number of event contracts a consumer can enter on Kalshi's platform, meaning if a person wants to bet $300 on a particular game, they can simply purchase $300 worth of individual event contracts (e.g., purchasing 1,000 contracts at $.30 each).

40.     When individuals buy a "yes" or "no" side of Kalshi's event contracts, Kalshi takes custody of the corresponding funds. Once the specified event occurs – e.g., Denver beat Las Vegas 10-7 on November 6, 2025[11] – Kalshi acts as a broker by settling the event contract and paying $1/contract to the consumer who predicted correctly (minus Kalshi's fee as described in more detail below) and $0 to the consumer who predicted incorrectly.

**B.      Kalshi Expands its Sports Betting Offerings**

41.     In or around August 2025, Kalshi began diversifying its sports betting operation by offering virtually every form of sports betting.

---

[11] *Las Vegas Raiders Versus Denver Broncos*, ESPN, https://perma.cc/T7RU-UMSK.

42.    Kalshi offers traditional moneyline bets related to which team will win a particular game. For example, as of May 30, 2026, Kalshi offered the following bet on Game 7 of the NBA playoffs, Western Conference Finals, between the Oklahoma City Thunder and the San Antonio Spurs:



43.    Kalshi offers point spreads related to whether a team will win or lose a game by a set number of points. For example, as of May 30, 2026, Kalshi offered the following on Oklahoma City-San Antonio Game 7:



44.    Kalshi offers over/under bets related to whether a specific team or individual will score over or under a set number of points. For example, as of May 30, 2026, Kalshi offered the following on Oklahoma City-San Antonio Game 7:



45.    Kalshi offers proposition bets related to whether a specified event will occur in a sporting event, such as whether a given basketball player will score a specified number of points. For example, as of May 30, 2026, Kalshi offered the following on Oklahoma City-San Antonio Game 7:



11

46.     Kalshi offers combo or parlay bets which combine outcomes of two, three, or a hundred different bets into a single wager, all of which must individually win in order for the bettor to be successful. For example, as of May 30, 2026, Kalshi offered the following on Oklahoma City-San Antonio Game 7:



C.     **Kalshi Acts as a Sportsbook By Taking, Paying On, and Earning Commission on Sports Bets**

47.     Kalshi has taken on the traditional role of sportsbook by facilitating bets and retaining a fee for its services.

48.     Both Kalshi and a sportsbook serve as a sophisticated counterpart sitting between bettors, setting terms, deciding outcomes, and collecting a commission for each sports bet placed.

49.     Kalshi is responsible for accepting users' bids on so-called event contracts, determining the outcomes of sporting events, issuing payouts for the winning side, and moving funds between users.

50.    In exchange for its services, Kalshi "generates revenue through small transaction fees on each trade,"[12] the functional equivalent of a sportsbook's commission.

51.    Specifically, Kalshi charges these transaction fees as a "variable percentage fee of the expected earnings on an individual contract, which is calculated by multiplying the maximum potential earnings from the contract by the implied probability of making those earnings[.]"[13]

52.    As of the date of this Complaint, Kalshi's transaction fees range from $0.07 to $1.75 per 100 event contracts, with various deviations for specific wagers.[14]

53.    The variable nature of Kalshi's transaction fees allows Kalshi to manage the individual risks posed by each "event contract" in the same way a sportsbook includes its vigorish, or vig—a commission—when setting odds for a sports bet so the sportsbook makes money regardless of the event's outcome.[15]

**D.    Kalshi Acts As a Sportsbook by Ensuring Any Bettor Can Bet on Either Side at Any Time.**

54.    Just as with traditional sportsbooks, for Kalshi's model to work, each event contract must have a taker on both sides, meaning that for each "yes" event contract placed on a particular sporting event, there must be a corresponding "no" event contract to complete the wager.

55.    While Kalshi attempts to match individual users for each event contract, to ensure that users can enter into event contracts on any event at any time, Kalshi, through its subsidiary

---

[12] Julian Zhang, *What Is Kalshi? A Beginner's Guide,* Kalshi News (Feb. 9, 2026), https://perma.cc/3BPA-Q7H7.
[13] Kalshi, *Fee Schedule for Feb 2026* (Feb. 5, 2026), https://perma.cc/9ZNJ-U8S9.
[14] Kalshi, *Fee Schedule,* https://perma.cc/S2S5-L9YS.
[15] Brad Szalach, *What Is Vig In Sports Betting?*, Legal Sports Report (July 15, 2024), https://perma.cc/84DA-XVMS.

Kalshi Trading LLC, operates as a so-called "market maker" for various sporting events hosted on Kalshi's platform.[16]

56.     Kalshi thus enters into event contracts itself to ensure there is always an opposition position to every individual consumer's bet. Put another way, if an individual places a "no" bet but no individual has placed a corresponding "yes" bet, prior to the sporting event, Kalshi will itself enter the "yes" bet to facilitate the lone individual's "no" bet.

57.     Kalshi has operated as a market maker on its platform since at least 2023, describing Kalshi Trading LLC as a "significant player on the exchange."[17]

58.     By directly participating in the sports bets offered on its platform, Kalshi trades against the platform's users by entering into sports-related event contracts and profits on customer trades, win or lose.

59.     Kalshi describes market makers like Kalshi Trading LLC as having a "primary role… to provide liquidity to the market to ensure people can easily enter and exit their positions." Kalshi goes on to explain that market makers do this "by buying a contract, and then soon after selling that contract to someone else at a slightly higher price" and thus "make money by collecting the spread (the difference between the bid and ask)[.]"[18]

60.     On March 3, 2025, Kalshi introduced its "Market Maker Program" which sought to expand the number of market makers like Kalshi Trading LLC on the platform to increase

---

[16] Dan Bernstein, et al., *Kalshi's Trading Arm Muddles 'Peer-to-Peer' Claims*, Sportico (Sept. 11, 2025), https://perma.cc/N4PX-MJDM.

[17] Kalshi, *Who am I trading with on Kalshi?*, Kalshi News (May 5, 2023), https://perma.cc/L5G2-5UPW.

[18] Kalshi, *Who are you trading with?* (Mar. 10, 2026), https://perma.cc/G5ST-ALQQ.

liquidity and "help prevent price swings by absorbing temporary imbalances in supply and demand."[19]

61.    Kalshi provides financial incentives for those participating in its Market Maker Program, by offering "reduced fees and certain adjusted position limits" in exchange for meeting "defined quoting and volume requirements[.]"[20]

62.    Both Kalshi's participation as, and general reliance on, professional market makers to provide liquidity on their platform mirror traditional sportsbooks, which take bets and shift odds based on betting patterns to encourage bettors to wager on the opposite side of an event and help maintain even exposure on both outcomes. In both cases, a sophisticated market maker is absorbing bets, setting prices, and balancing risk across participants.

E.    **Kalshi Promotes and Facilitates Addictive Gambling Activities in New Mexico, and Evades State Efforts to Address this Public Health Issue**

63.    Individuals in New Mexico, including those 18 to 20 years old, can participate in the full panoply of sports betting options available on Kalshi's platform.

64.    Individuals in New Mexico access Kalshi's platform through its website – Kalshi.com – or its mobile applications available for Android and Apple devices.[21]

---

[19] Kalshi, *How to Become a Market Maker on Kalshi* (April 29, 2026), https://perma.cc/W3NN-YLKJ.

[20] *Id.*

[21] To access Kalshi's platform, users must create an account by providing basic personal information and complete identity verification, which typically involves submitting identification documents such a state driver's license or passport. Once an account is created, Kalshi collects each individual user's precise location data, including both current and historical information concerning the user's geographic location, GPS location, transaction location, and IP addresses through a variety of methods including GPS, Wi-Fi, and wireless network triangulation. Kalshi, *Kalshi Privacy Policy*, https://perma.cc/K24G-STHX. To reduce risk, Kalshi requires all trades to be "fully cash collateralized" meaning all wagers placed on event contracts are fully funded once an event contract is agreed upon. This means that once Kalshi verifies the consumer's identity and age and an account is created, users must fund their account through a bank transfer, debit card, or cryptocurrency. Kalshi, *Who am I trading with on Kalshi?,* Kalshi News (May 5, 2023),

65.    Despite creating, operating, and offering to New Mexico residents a digital platform for placing sports bets, Kalshi has not sought licensure to do so through the State's Gaming Control Board.

66.    As set forth in paragraphs 100-111 below, New Mexico law requires Kalshi to obtain a gaming operator's or manufacturer's license from the Board, but Kalshi has not applied for either such license and has never possessed one.

67.    In failing to comply with New Mexico's licensing requirements applicable to sports betting, Kalshi has also evaded and undermined measures adopted by the State Legislature to address compulsive gambling, including measures which are part of the licensing process.

68.    New Mexico's statutory gaming provisions address compulsive gambling in multiple ways.

69.    Applicants for a gaming operator's license are required to submit a plan for the "prevention, education and treatment of compulsive gambling" with their application. NMSA 1978, § 60-2E-26(A). "Plan approval by the board is a condition of issuance of the license." *Id.*

70.    Racetrack gaming operator licensees are required to contribute one quarter of one percent of net gaming machine revenues toward the prevention, education, and treatment of compulsive gambling. NMSA 1978, § 60-2E-47(F).

71.    Additionally, NMSA 1978, Section 60-2E-34.1 directs the Board to develop rules that permit a compulsive gambler to voluntarily exclude him or herself from a gaming establishment. § 60-2E-34.1(A); NMAC 15.1.11.18. The Board submits a monthly notice to

---

https://perma.cc/L5G2-5UPW; Kalshi, *Deposit Funds*, https://perma.cc/P39Z-E27Y. Once an account is funded, the consumer is able to enter into any event contracts offered on the platform.

gaming establishments listing self-excluded persons and ordering removal of their names from direct mail, electronic advertisement or promotional lists. § 60-2E-34.1(C).

72.    Kalshi has not submitted a plan for the prevention, education and treatment of compulsive gambling, let alone received State approval. Unlike gaming operated by a State licensee, Kalshi's online platform allows individuals to gamble on Kalshi anywhere and at any time, allows underage gamblers to avoid in-person age verification, and evades the State's self-exclusion program administered by the GCB.

73.    Gambling addiction is a public health crisis throughout the country, including in New Mexico. Approximately two and a half million adults in the U.S. meet the criteria for severe gambling problems. An additional five to eight million adults experience problems due to their gambling behavior, with often devastating consequences to the individuals involved, their families, and their communities.[22]

74.    The American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) categorizes Gambling Disorder as an "addictive disorder." The symptoms of Gambling Disorder include an increased tolerance for gambling (i.e., wagering more money over time), repeated unsuccessful efforts to control, reduce, or stop gambling behavior, and lying or concealing the extent of gambling involvement from others.[23]

75.    According to recent studies, New Mexico experiences a prevalence of problem gambling that is significantly higher than national estimates. Specifically, in 2018 and 2019, 3.1%

---

[22] Nat'l Council on Problem Gambling, *Problem Gambling Fact Sheet*, https://perma.cc/Q3R4-XBML.

[23] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013).

to 3.9% of New Mexican adults screened positive for problem gambling, whereas the national average is 1%.[24]

76.    There is also a strong association between substance use behaviors and problem gambling in New Mexico, with problem gamblers "significantly more likely to report engaging in substance use behaviors compared to non-problem gamblers."[25]

77.    Since 2019, gambling – and sports betting in particular – have ballooned in popularity, with Americans betting over twenty-three billion dollars on sports in July, August, and September of 2023 alone, a 32.7% increase over the same period in 2022.[26]

78.    Recent studies have shown that the number of Americans searching for help with gambling addiction has ballooned in recent years, with online searches increasing 23% nationally since 2018.[27]

79.    A review of sports wagering and gambling addiction studies conducted by the National Council on Problem Gambling shows that "[t]he rate of gambling problems among sports bettors is at least twice as high as among gamblers in general . . . [and] the rate of problems is even higher" when sports wagering takes place online, "with one study of online sports gamblers indicating that 16% met clinical criteria for gambling disorder and another 13% showed some signs of gambling problems."[28]

---

[24] Monique Rodríguez, *et al. The Prevalence and Predictors of Problem Gambling Among Adults in New Mexico: A Sociodemographic Analysis.* 41 J. Gambl. Stud. 1305, 1314 (2025), https://perma.cc/N5N6-CB73.

[25] *Id.*

[26] Jake Navin, *The House Always Wins: Deceptive and Improper Conduct Plaguing the Sports Betting Industry and Legislation Congress Must Consider to Sustain the Market*, 15 UNLV Gaming L.J. 223, 223 (2025), https://perma.cc/39JH-9HB7.

[27] Atharva Yeola, et. al., *Growing Health Concern Regarding Gambling Addition in the Age of Sportsbooks*, JAMA Internal Med. 382, 384 (2025), https://perma.cc/4VE2-US5X.

[28] National Council on Problem Gambling, *A Review of Sports Wagering & Gambling Addiction Studies Executive Summary*, https://perma.cc/7JK5-QECS.

80.     Young males are at a disproportionally higher risk of developing problems with sports betting behaviors.[29]

81.     Kalshi's advertising targets this demographic by allowing anyone 18 or older to join, and leveraging social media campaigns and student influencers, amplifying exposure to this high-risk group.[30]

82.     Kalshi's design features capitalize on the younger 18 to 20 demographics by exploiting psychological triggers designed to encourage continued engagement, enticing frequent and continuing transactions with push notifications to users' phones and advertisements through sponsored influencers, and driving addictive behavior, with Kalshi acknowledging its platform is "kind of addicting."[31]

83.     Kalshi targets its internet-based advertising for its addictive offerings to users based on, e.g., their online browsing history and interests, which allows Kalshi to "facilitate new contests, sweepstakes, promotions, and rewards" and "tailor [] product offerings" based on a user's activity on the platform.[32]

84.     Amid growing concerns about young adults—particularly young men—engaging in harmful behavior related to sports betting, and the lack of in-person age verification for online betting, Kalshi has indicated its willingness to implement stronger age verification tools to make

---

[29] Vincent Mancini, et al., *Predicting Problem Gambling in Young Men: The Impact of Sports Gambling Frequency and Internalizing Symptoms*, 41 J. Gambling Stud. 1119, 1119 (2025), https://perma.cc/8WGF-SYZE.

[30] Katherine Long et al., *'Is This Insider Information?' The Prediction Market Bets Driving a Campus Frenzy*, Wall St. J. (Mar. 5, 2026), https://perma.cc/HG9F-B7XX.

[31] Dustin Gouker, *Kalshi Says It's 'Kind of Addicting' in Instagram Post,* Event Horizon (Oct. 21, 2025), https://perma.cc/Q6RV-TKST.

[32] Kalshi, *Kalshi Privacy Policy,* https://perma.cc/K24G-STHX

it more difficult for those under the age of 18 to use its platform. However, Kalshi has made clear it will continue to offer its platform to those between the ages of 18 and 20.[33]

85.    Importantly, the semantics Kalshi employs to distinguish its event contracts from sports betting do not change the detrimental impact its platform has on the public, with a recent study from the American Gaming Association showing that 85% of Americans believe prediction markets' sports categories amount to gambling.[34]

## IV.    LEGAL BACKGROUND

### A.    <u>New Mexico's Longstanding Criminal Prohibitions On Gambling</u>

86.    New Mexico law has long criminalized gambling in the State and before statehood, in the Territory.  *See*, *e.g.*, Compiled Laws of New Mexico, Tit. IX, Ch. 5, § 880 (1884) ("Crimes and Offenses — Punishments;" "Gaming and Vagrancy").[35]

87.    Since 1953, the New Mexico Criminal Code has broadly criminalized all forms of gambling with only limited statutory exceptions. NMSA 1978, §§ 30-19-1 to -15; *see generally Citation Bingo, Ltd. v. Otten*, 1996-NMSC-003, ¶ 6, 121 N.M. 205 ("With limited exceptions, gambling is a crime in New Mexico."); *Schnoor*, 1968-NMSC-067, ¶ 27 ("Except in very limited circumstances, the public policy of this state is to restrain and discourage gambling."); *Ross*, 1958-NMSC-117, ¶ 10.

---

[33] Nathan Bomey, *Exclusive: Kalshi announces steps to keep kids off prediction market*, Axios (May 4, 2026) https://perma.cc/C3DS-MGM9.

[34] American Gaming Association, Sports Event Contracts: Public Opinion Landscape, (Sept. 10, 2025) https://perma.cc/F8W8-R9S5.

[35] Pursuant to Section 880, "[i]f any person shall play any game, with cards or dice, or any device or substitute for the same, in any tavern, inn, store-house, or grocery, where spiritous liquors are sold, or house or place where spiritous or malt liquors are retailed or given away; or in any public house, street, public plaza or highway, or in any other public place . . . such persons on conviction thereof shall be fined in any sum not less than five nor more than one hundred dollars."

88.     Under Section 30-19-2 of the Criminal Code, "gambling" is broadly defined to include activities such as "making a bet" and "conducting a lottery."

89.     A "bet" is defined as "a bargain in which the parties agree that, dependent upon chance, even though accompanied by some skill, one stands to win or lose anything of value specified in the agreement," with limited exceptions not applicable here.  § 30-19-1(B).

90.     The Criminal Code separately prohibits "commercial gambling" which includes both "receiving, recording or forwarding bets or offers to bet" and "setting up for use, for the purpose of gambling, or collecting the proceeds of, any gambling device." § 30-19-3(B), (F).

91.     In turn, a "gambling device" is defined, in relevant part, as any "contrivance… that, for a consideration, affords the player an opportunity to obtain anything of value, the award of which is determined by chance, even though accompanied by some skill, whether or not the prize is automatically paid by the device." § 30-19-1(C).

**B.     The Gaming Control Act is the Sole Source of Regulated Gaming Under New Mexico Law.**

92.     Over time the Legislature has enacted laws to permit and regulate specific types of conduct that would otherwise fall under the definition of gambling in the Criminal Code.  For example, the State legalized a regulated state-operated lottery system through the New Mexico Lottery Act, NMSA 1978, Sections 6-24-1 to -34 (1995, as amended through 2007), horse racing conducted at licensed and regulated racetracks through the Horse Racing Act, NMSA 1978, Sections 60-1A-1 to -31 (2007, as amended through 2023), and certain types of bingos and raffles through the New Mexico Bingo and Raffle Act, NMSA 1978, Sections 60-2F-1 to -26 (2009, as amended through 2019).

21

93.    Most relevant to this Action, in 1997 the Legislature passed the GCA, NMSA 1978, Sections 60-2E-1 to -62 (1997, as amended through 2023), which permits gaming regulated under that Act and introduces a robust licensing regime.

94.    The GCA declares the State's policy on gaming, which provides that "limited gaming activities" should only be allowed "if those activities are strictly regulated to ensure honest and competitive gaming that is free from criminal and corruptive elements and influences." § 60-2E-2(A).

95.    The Board administers the GCA. The Board is comprised of five members. § 60-2E-5(A). Four, from four different statutorily required fields (law enforcement, certified public accountant, attorney, and business management and financing), are appointed by the Governor with the advice and consent of the Senate. *Id.* One "ex-officio" member is the chairman of the State's racing commission. *Id.* Board members are subject to fulsome background investigations, § 60-2E-5(H), conflict-of-interest requirements, § 60-2E-5(I), (K), and ethical and criminal background screening by the Senate, § 60-2E-5(J)(1)-(4).

96.    The Act defines "gaming" as "offering a game for play." § 60-2E-3(P). A "game" is any "activity in which, upon payment of consideration, a player receives a prize or other thing of value, the award of which is determined by chance even though accompanied by some skill[.]" § 60-2E-3(O).

97.    Under the GCA, all gaming activity is prohibited unless permitted. *See* § 60-2E-4 ("Gaming activity is permitted in New Mexico *only* if it is conducted in compliance with and pursuant to" the GCA, or "a state or federal law other than the Gaming Control Act that *expressly*

permits the activity or exempts it from the application of the state criminal law, or both." (emphases added)).[36]

98.    The Act also regulates any "manufacturer," which encompasses any person or entity who "manufactures, fabricates, assembles, produces, programs or makes modifications to any gaming device for use or play in New Mexico[.]" § 60-2E-3(EE).

99.    A "gaming device" is defined as "associated equipment or a gaming machine." § 60-2E-3(R), and a "gaming machine" is the "electronic contrivance" that facilitates actual gaming, § 60-2E-3(U). Specifically, it is any electronic device that "upon payment of any consideration, is available to play or operate a game, whether the payoff is made automatically from the machine or in any other manner." *Id.*

### (1)    The GCA's Licensing Regime

100.    Only licensed gaming operators may conduct gaming within the State, § 60-2E-13(A), and "[o]nly a racetrack licensed by the state racing commission or a nonprofit organization" is eligible to apply for or receive a gaming operator's license, § 60-2E-26(I). "No other persons are qualified to apply for or be issued a gaming operator's license pursuant to the Gaming Control Act." *Id.*

101.    Manufacturers of gaming devices must also obtain a license from the Board before operating in the State. § 60-2E-13(B) ("A person shall not sell, supply or distribute a gaming device

---

[36] The only sports betting that has been expressly permitted within the territorial boundaries of New Mexico occurs on tribal lands under individual compacts between the State and federally recognized Indian tribes and pueblos under the Indian Regulatory Gaming Act, 25 U.S.C. §§ 2701-2721 ("IGRA").  At least six tribes and pueblos currently offer and regulate in-person sports betting on their respective tribal lands.

or associated equipment for use or play in this state or for use or play outside of this state from a location within this state unless the person is licensed as a distributor or manufacturer.").

102. All applicants for gaming licenses are required to submit applications to the Board. The rigorous application process established by the GCA includes background investigations through review of fingerprint matches, state and federal criminal records, business activities, financial affairs, and business associates for at least a ten-year period preceding the application. § 60-2E-14.

103. As to corporate entities, the GCA requires that corporate applicants be organized and in good standing in their state of organization, qualified to do business in New Mexico, in compliance with all other applicable New Mexico laws, and maintaining a ledger at the corporation's principal place of business in New Mexico which documents the ownership of the entity. § 60-2E-18.

104. If a corporate applicant or licensee undergoes changes to its corporate structure, the GCA further requires the entity to notify the GCB and provide any relevant information including but not limited to the names of directors and officers, relevant financial records, and a description of all affiliated companies and any gaming-related approvals held by those companies. § 60-2E-22(A).

105. The GCA states that the public interest requires any key executive who holds or applies for a gaming license to individually apply for and obtain a "certification of finding of suitability." § 60-2E-20; *see also* 15.1.16 NMAC. To apply for certification, key executives must submit their personal history, a financial statement, copies of income tax records, and any other relevant information deemed necessary or appropriate by the GCB. § 60-2E-20.

24

106.    All applicants for gaming licenses have the burden of proof in demonstrating their qualification, and the GCB can only issue a gaming license if it finds the applicant and their key executives are "of good moral character, honesty and integrity" and "do not pose a threat to the public interest or to the effective regulation…of gaming" or "create or enhance the dangers of unsuitable, unfair or illegal practices, methods and activities in the conduct of gaming[.]" § 60-2E-16(B).

107.    All licenses issued under the GCA are for one-year periods, and upon expiration the GCB must review each license to determine whether it should be renewed. § 60-2E-14(F).

108.    Any license issued under the GCA is a "revocable privilege" which can be revoked, suspended, canceled, or terminated by the GCB at any time. § 60-2E-2(B); § 60-2E-14(F).

109.    Licensees are also required to pay annual licensing fees including up to $50,000 for a gaming operator's license and $20,000 for a license to a distributor who deals in gaming devices. § 60-2E-15.

110.    The GCA also imposes a "gaming tax" on all licensees "in lieu of all state and local gross receipts taxes." § 60-2E-47(A), (C).

111.    For a manufacturer licensee, the gaming tax is "equal to ten percent of the gross receipts…from the sale, lease or other transfer of gaming devices in or into the state" except for sales made to a licensed distributor for subsequent sale. § 60-2E-47(B). For a gaming operator licensee, the gaming tax is ten percent if the licensee is a nonprofit and "twenty-four and eight-tenths percent" for all other gaming operators. *Id.*

### (2)    The GCA's Age Restriction

112.    In passing the GCA, the Legislature established strict age requirements for gaming activities. The GCA mandates that anyone under the age of twenty-one years "shall not[] play, be

25

allowed to play, place wagers on or collect winnings from, whether personally or through an agent, any game authorized or offered to play pursuant to the Gaming Control Act" or be employed by a gaming operator or gaming facility. § 60-2E-37; *see also*, *e.g.*, § 60-2E-26(E) (establishing "[g]aming machines may be available for play only in an area restricted to persons twenty-one years of age or older").

113.    As originally introduced, the GCA treated the offense of knowingly facilitating underage gaming as a misdemeanor. S.B. 701, 42d Leg., 2d Sess. (N.M. 1996); H.B. 735, 42d Leg., 2d Sess. (N.M. 1996).

114.    However, as passed in 1997 and in effect today, the GCA imposes harsher criminal penalties on knowingly facilitating underage gaming, mandating that "[a] person who knowingly permits an individual who the person knows is younger than twenty-one years of age to participate in gaming is guilty of a fourth degree felony." § 60-2E-56(A).

115.    The GCA also punishes underage gaming itself as a misdemeanor. *See* § 60-2E-56(B) ("An individual who participates in gaming when he is younger than twenty-one years of age at the time of participation is guilty of a misdemeanor[.]")

116.    Sports betting falls squarely within the Criminal Code's umbrella definition of gambling which includes "making a bet," § 30-19-2, and also meets the GCA's definition of "gaming" as an activity in which an individual, upon payment of consideration, may receive something of value which is determined, at least in part, by chance, *see* § 60-2E-3(P), (O).

C.      **The Attorney General Has Multiple Bases for Bringing a Public Nuisance Action To Abate Illegal Gambling and Gaming Activities**

117.    The Attorney General has three sources of authority to bring this action to abate a public nuisance: (1) under statute providing that an unlawful gambling device is a per se public

26

nuisance, NMSA 1978, § 30-19-8, (2) under New Mexico's public nuisance statute, NMSA 1978, §§ 30-8-1, -8-8 (1963, as amended through 2025), and (3) under New Mexico common law.

### (1) The GCA Authorizes the Attorney General to Seek Abatement of the Public Nuisance of Gambling Devices.

118. The GCA states that, "any gambling device . . . is a public nuisance per se," except as otherwise permitted or excepted under Article 19 of the Criminal Code. § 30-19-8.

119. The Act grants the Attorney General to institute an "injunction proceeding to have such public nuisance abated." § 30-19-8.

### (2) The State's Public Nuisance Statute Provides the Attorney General Independent Authority to Seek Abatement for a Public Nuisance.

120. In addition, the Attorney General has statutory authority to bring an action to abate a public nuisance under New Mexico's Public Nuisance Statute. §§ 30-8-1, -8-8.

121. Under the Statute, "[a] public nuisance consists of knowingly creating, performing or maintaining anything affecting any number of citizens without lawful authority which is… injurious to public health, safety, morals or welfare." § 30-8-1(A).

122. Section 30-8-8 authorizes a "public officer" to bring a civil action to abate such a public nuisance.

123. Because Kalshi's operations are a public nuisance affecting the public health and well-being of New Mexico residents writ large and have been undertaken without proper licensure, thereby impairing the State's sovereign interests, the interest of the State requires the Attorney General to prosecute the instant action.

### (3) Additionally, New Mexico Common Law Recognizes a Civil Action for Abatement of a Public Nuisance.

124. Apart from the aforementioned statutory provisions, New Mexico common law recognizes a civil action to abate a public nuisance. *See, e.g., State ex rel. Vill. of Los Ranchos de*

27

*Albuquerque v. City of Albuquerque*, 1994-NMSC-126, ¶ 52, 119 N.M. 150 (holding common law public nuisance claims and claims brought under the Public Nuisance Statute are "similar"); *Espinosa v. Roswell Tower, Inc.*, 1996-NMCA-006, ¶ 9, 121 N.M. 306 (same); *see also State ex rel. Marron v. Compere*, 1940-NMSC-041, ¶ 10, 44 N.M. 414 (acknowledging as well established "that injunctive relief may be employed to protect the public health, morals, safety and welfare from irreparable injury by a public nuisance").

125.    The common law definition of a public nuisance is an "unreasonable interference with a right common to the general public." *State ex rel. Vill. of Los Ranchos de Albuquerque*, 1994-NMSC-126, ¶ 52. As defined by our Supreme Court, as "long as the nuisance will interfere with those who come in contact with it in the exercise of a public right or it otherwise affects the interests of the community at large," the definition is satisfied. *Id.*

126.    A nuisance per se at common law is "an activity, or an act, structure, instrument, or occupation which is a nuisance at all times and under any circumstances, regardless of location or surroundings." *Id.*, ¶ 53.

127.    Finally, under either statutory authority or common law authority, the Attorney General can bring a public nuisance claim to abate violations of the Criminal Code, including Section 30-19-3's prohibitions on "commercial gambling" such as the "receiving, recording or forwarding bets or offers to bet" and "setting up for use, for the purpose of gambling, or collecting the proceeds of, any gambling device." § 30-19-3(B), (F); *see also*, *e.g.*, § 30-8-1(A) (Attorney General has authority to abate activities "without lawful authority" that constitute a public nuisance); *State ex rel. Bigney v. City of Rio Rancho*, No. A-1-CA-40664, 2025 WL 227194, ¶ 17 (N.M. Ct. App. Jan. 16, 2025) ("We have generally construed Section 30-8-1 as encompassing the common law prohibitions on public nuisance") (internal quotations and citations omitted).

28

128.    This authority similarly extends to a public nuisance claim to abate violations of Section 30-19-15(A) of the Criminal Code, which proscribes the facilitation of sports gambling by forbidding the charging of a fee to "knowingly accept . . . anything of value from another to be transmitted or delivered for gambling or parimutuel [] wagering on the results of a race, sporting event, contest or other game of skill or chance or any other unknown or contingent future event or occurrence whatsoever."

129.    Section 30-19-15(A)'s reference to both "gambling" and "parimutuel wagering" covers any and all sports betting, including both traditional sports betting on the outcome of a specific sporting event with odds set by and bets placed with a sportsbook, as well as pooled betting where all bets of a particular type are pooled and odds fluctuate based on the bets of other participants. *See Parimutuel Betting*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("[a] system of gambling in which bets placed on a race are pooled and then paid (less a management fee and taxes) to those holding winning tickets.").

V.    **CAUSES OF ACTION**

**COUNT I**
**VIOLATION OF NEW MEXICO GAMING CONTROL ACT**
**NMSA 1978, § 60-2E-13(A)**
***Unlicensed Gaming***

130.    The State re-alleges all prior averments of this Complaint as if fully set forth herein.

131.    Except for narrow statutory exclusions not applicable here, New Mexico law requires any entity or individual offering gaming to the public to be licensed under the GCA. § 60-2E-13(A) (A person or legal entity "shall not conduct gaming unless [they are] licensed as a gaming operator.").

132.    Defendants conduct gaming by offering New Mexicans who are 18 years of age or older the ability to bet on sports, that is to pay consideration (i.e., purchase an "event contract" and

pay Defendants' "trading fee") for the chance to receive something of value (i.e., the contract payout) which is determined, at least in part, by chance. *See* § 60-2E-3(O), (P).

133. Since Defendants conduct gaming, they are required to be licensed as a gaming operator. §§ 60-2E-13(A); 60-2E-3(V).

134. Defendants have not applied for and do not possess a license as required by the GCA in order to conduct gaming in New Mexico.

135. Further, "[o]nly a racetrack licensed by the state racing commission or a nonprofit organization" is eligible to receive a gaming operator license in New Mexico. § 60-2E-26(I). "No other persons are qualified to apply for or be issued a gaming operator's license pursuant to the Gaming Control Act." *Id.*

136. Defendants are not a racetrack licensed by the state racing commission or a nonprofit organization and therefore do not qualify for a gaming operator license, even if they applied for one.

137. As such, Defendants are an unlicensed gaming operator because: (1) they did not seek a license and (2) they are ineligible for a license.

138. By offering New Mexicans the ability to game on its platform, Defendants are in continuing violation of Section 60-2E-13(A) of the GCA by offering unlicensed online sports gaming outside of the regulatory framework established by the GCA.

**COUNT II**
**VIOLATION OF NEW MEXICO GAMING CONTROL ACT**
**NMSA 1978, § 60-2E-13(B)**
*Unlicensed Manufacturer of a Gaming Device*

139. The State re-alleges all prior averments of this Complaint as if fully set forth herein.

140. New Mexico law requires any entity or individual selling, supplying, or distributing a gaming device for use in New Mexico to be licensed under the GCA. § 60-2E-13(B) ("A person

30

shall not sell, supply or distribute a gaming device or associated equipment for use or play in this state or for use or play outside of this state from a location within this state unless the person is licensed as a distributor or manufacturer.").

141.    Defendants' digital platform constitutes a "gaming machine" and for purposes of the GCA because it provides users the ability to engage in and receive consideration from gaming in exchange for the transaction fees collected by Defendants. § 60-2E-3(U) ("[G]aming machine" means a…electronic contrivance or machine that, upon…payment of any consideration, is available to play or operate a game, whether the payoff is made automatically from the machine or in any other manner.").

142.    Because the GCA defines "gaming device" to include "gaming machine," Defendants' platform is also a "gaming device." § 60-2E-3(R).

143.    Kalshi, as the producer and programmer of its platform, is acting as a "manufacturer" of a gaming device which must be licensed under the GCA. § 60-2E-3(EE) ("'[M]anufacturer' means a person who manufactures, fabricates, assembles, produces, programs or makes modifications to any gaming device for use or play in New Mexico or for sale, lease or distribution outside New Mexico from any location within New Mexico.").

144.    Kalshi has not applied for a manufacturer's license from the GCB, which is required before it can supply its platform for use by New Mexicans.

145.    By offering New Mexicans the ability to obtain and utilize its platform, Kalshi has supplied an unlicensed gaming device in this State which, for payment, allows individuals the ability to conduct gaming and receive payouts from gaming. Therefore, Kalshi is in continuing violation of Section 60-2E-13(B) of the GCA.

**COUNT III**
**VIOLATION OF NEW MEXICO GAMING CONTROL ACT**
**NMSA 1978, §§ 60-2E-37 and 56(A)**
*Unlawful Provision of Gaming and/or Gaming Device to 18–20-Year-Old Individuals*

146.    The State re-alleges all prior averments of this Complaint as if fully set forth herein.

147.    Pursuant to Section 60-2E-37, New Mexico imposes strict age requirements on those who participate in gaming, mandating that anyone under the age of twenty-one years "shall not play, be allowed to play, place wagers on or collect winnings from, whether personally or through an agent, any game authorized or offered to play pursuant to the Gaming Control Act[.]"

148.    Section 60-2E-56(A) provides that a person who knowingly violates the GCA's age restriction and permits an individual who is younger than twenty-one years of age to participate in gaming is guilty of a fourth-degree felony.

149.    As alleged in paragraphs 28-85 above, Kalshi conducts gaming in New Mexico as defined by the GCA and allows individuals who are at least 18 years-old the opportunity to pay consideration (i.e., purchase a contract and paying Kalshi's trading fee), for the chance to receive something of value (i.e., the event contract payout) which is determined, at least in part, by chance. § 60-2E-3(O).

150.    Kalshi actively advertises its platform as available to any consumer age of 18 years old or older, and to create an account on the platform an individual consumer must meet Kalshi's age verification requirements, including a user's name, permanent address, date of birth, and presentation of valid form of government issued identification.

151.    Kalshi also collects location data related to the users on its platform and has detailed knowledge of where their users live and/or are located at any given time when on the platform.

32

152.    Kalshi confirms the age of users prior to granting access to the platform and therefore knowingly allows New Mexicans between the ages of 18 and 20 access to gaming and to its gaming device.

153.    By knowingly allowing New Mexicans under the age of 21 to conduct gaming on its platform, Kalshi is in continuing violation of the GCA.

**COUNT IV**
**PUBLIC NUISANCE**
**NMSA 1978, § 30-19-8, § 30-8-8, common law**

154.    The State re-alleges all prior averments of this Complaint as if fully set forth herein.

**Per Se Public Nuisance Under NMSA 1978, § 30-19-8**

155.    The Attorney General may bring an action to abate unlicensed gambling devices, which are a public nuisance per se under New Mexico law. § 30-19-8.

156.    New Mexico's Criminal Code defines "gambling devices" as any "contrivance . . . not licensed for use pursuant to the [GCA] and that, for a consideration, affords the player an opportunity to obtain anything of value, the award of which is determined by chance . . . whether or not the prize is automatically paid by the device." § 30-19-1(C).

157.    Defendants' platform is a "gambling device" under the Criminal Code because it allows individuals in New Mexico to pay consideration, both in purchasing the event contract and paying Defendants' transaction fee, in exchange for an opportunity to obtain something of value, the payout of the contract, the award of which is determined in part by chance and paid out by the platform.

158.    Kalshi is not licensed and has never applied for a license under the GCA to supply a gaming device in New Mexico. § 60-2E-13(B) ("A person shall not sell, supply or distribute a gaming device or associated equipment for use or play in this state or for use or play outside of

33

this state from a location within this state unless the person is licensed as a distributor or manufacturer.").

159.    By offering an unlicensed gambling device to New Mexicans, Defendants are actively creating a public nuisance per se in violation of § 30-19-8.

**Public Nuisance Under NMSA 1978, § 30-8-1(A)**

160.    The Attorney General also has statutory authority to bring an action to abate a public nuisance under New Mexico law. § 30-8-8(B) ("A civil action to abate a public nuisance may be brought, by verified complaint in the name of the state without cost, by any public officer or private citizen, in the district court of the county where the public nuisance exists, against any person, corporation or association of persons who shall create, perform or maintain a public nuisance.").

161.    Section 30-8-1(A) states that "[a] public nuisance consists of knowingly creating, performing or maintaining anything affecting any number of citizens without lawful authority which is… injurious to public health, safety, morals or welfare."

162.    Moreover, by imposing and retaining their "trading fee" prior to distributing the proceeds of each sports related bet on their platform, Kalshi violates Section 60-2E-13(A)'s prohibition on facilitating sports betting as Kalshi knowingly accepts, in exchange for their trading fee, financial payments from their users for the purposes of "gambling or parimutuel [] wagering on the results of a race, sporting event, contest, or other game of skill or chance." § 30-19-15.

163.    Defendants are offering gaming in the State of New Mexico without a license (*see supra* paragraphs 130-38), operating as manufacturers of gaming devices without a license (*see supra* paragraphs 139-45), and offering gaming to individuals under the statutory minimum age of 21 (*see supra* paragraphs 146-53).

164.    Through these actions, Kalshi actively induces New Mexico residents to engage in criminal behavior by participating in prohibited gambling and gaming activities on Defendants' platform. *See* § 30-19-2 ("Whoever commits gambling is guilty of a petty misdemeanor."); § 60-2E-56 ("An individual who participates in gaming when he is younger than twenty-one years of age at the time of participation is guilty of a misdemeanor.").

165.    Defendants' conduct also violates New Mexico public policies whereby gaming and gambling are "strictly regulated to ensure honest and competitive gaming that is free from criminal and corruptive elements and influence," § 60-2E-2(A), and "[e]xcept in very limited circumstances," the State aims to "restrain and discourage gambling," *Schnoor*, 1968-NMSC-067, ¶ 27.

166.    Furthermore, Kalshi's unlawful operations in New Mexico impair the public health and safety of New Mexico's citizenry for the reasons set forth in paragraphs 63-85 supra.

167.    Because Kalshi has knowingly created or maintained its digital gaming platform without lawful authority and because this impacts a large number of New Mexico residents in ways that are injurious to public health, safety, and welfare, Defendants present a public nuisance within the definition set forth in Section 30-8-1(A).

168.    The Attorney General is authorized to seek abatement on behalf of the State of New Mexico for this public nuisance under Section 30-8-8.

**Common Law Public Nuisance**

169.    Separate from these statutory provisions, New Mexico common law also recognizes a civil action for a per se public nuisance.

170. A nuisance per se at common law is "an activity, or an act, structure, instrument, or occupation which is a nuisance at all times and under any circumstances, regardless of location or surroundings." *State ex rel. Vill. of Los Ranchos de Albuquerque*, 1994-NMSC-126, ¶ 53.

171. As "long as the nuisance will interfere with those who come in contact with it in the exercise of a public right or it otherwise affects the interests of the community at large," this definition is satisfied. *Id* ¶ 52.

172. Kalshi meets the definition of a common law nuisance per se. Defendants' conduct constitutes an unreasonable interference with protected rights of the public because Kalshi actively entices the public to commit crimes under New Mexico law.

173. Additionally, Kalshi's offering of an unregulated, unlicensed online sports betting platform affects the interests of the community at large, as described above.

174. The Attorney General has authority to institute civil proceedings to seek declaratory and injunctive relief to abate a common law nuisance pursuant to Section 8-5-2, which grants the authority to "prosecute and defend in any other court or tribunal all actions and proceedings, civil or criminal, in which the state may be a party or interested when, in his judgment, the interest of the state requires such action."

175. Plaintiff, the State of New Mexico, seeks all legal and equitable relief as allowed by law, including injunctive relief and abatement of the public nuisance.

## VI. PRAYER FOR RELIEF

**WHEREFORE**, the State of New Mexico, by and through its Attorney General, respectfully prays that this Court grant the following relief:

1. Entering judgment in favor of the State in a final order against Defendants;

2.      Permanently enjoining Defendants and their employees, officers, directors, agents, assigns, successors, subsidiaries, and other persons acting in concert or participation with Defendants, from engaging in:

a.      Sports related "gambling" as defined by the New Mexico Criminal Code;

b.      A "gambling device" as defined by the New Mexico Criminal Code that facilitates sports gambling;

c.      Sports related "gaming" as defined by the New Mexico Gaming Control Act; and

d.      A "gaming device" as defined by the New Mexico Gaming Control Act that facilitates sports gaming;

3.      Declaring that Defendants' unreasonable and unlawful conduct created a public nuisance;

4.      An order that Defendants abate the public nuisance caused by Defendants' unlawful conduct;

5.      All other relief as provided by law and/or as the Court deems appropriate and just.

Dated: June 4, 2026                          **RAÚL TORREZ**
                                             **ATTORNEY GENERAL OF NEW MEXICO**

                                             By:___ */s/ Mark Noferi*_____
                                                    Mark Noferi
                                                    Senior Litigation Counsel
                                                    Olivia den Dulk
                                                    Assistant Attorney General
                                                    Impact Litigation Division
                                                    **NEW MEXICO DEPARTMENT OF JUSTICE**
                                                    408 Galisteo Street
                                                    Santa Fe, NM 87501
                                                    (505) 640-2891
                                                    mnoferi@nmdoj.gov
                                                    odendulk@nmdoj.gov

37

**KEEGAN RICHARDSON SOLIMON & WEST LLP**
Justin J. Solimon
Jesse D. Heibel
Kayla J. Jankowski
7424 4th Street, N.W.
Los Ranchos de Albuquerque, NM 87107
(505) 842-6124
jsolimon@indiancountrylaw.com
jheibel@indiancountrylaw.com
kjankowski@indiancountrylaw.com

*Attorneys for Plaintiff*

# EXHIBIT 2

**STATE OF NEW MEXICO**
**COUNTY OF SANTA FE**
**FIRST JUDICIAL DISTRICT COURT**

**STATE OF NEW MEXICO, EX REL.,**
**RAÚL TORREZ, ATTORNEY GENERAL,**


          **Plaintiff,**

**vs.**

**KALSHI, INC. and KALSHIEX LLC,**       No. D-101-CV-2026-01567
**a Delaware Limited Liability Company,**
 **Defendants.**


### NOTICE OF REMOVAL

    TO THE CLERK OF THE FIRST JUDICIAL DISTRICT, COUNTY OF SANTA FE:

    PLEASE TAKE NOTICE that the above-titled action is removed by Defendants

KALSHI INC. and KALSHIEX LLC to the United States District Court for the District of New

Mexico, pursuant to 28 U.S.C. § 1446. A copy of the Notice of Removal filed with the United

States District Court for the District of New Mexico is attached as Exhibit 1. Pursuant to 28

U.S.C. § 1446(d), this Court shall proceed no further with this action.

DATED this 8th day of June, 2026.

**SNELL & WILMER**

*s/Jennifer Hadley-Catero*
Jennifer Hadley Catero
Erica J. Stutman
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
Telephone : 602.382.6000
jcatero@swlaw.com
estutman@swlaw.com

**MILBANK LLP**
Neal Kumar Katyal (*Pro hac vice* forthcoming)
Joshua B. Sterling (*Pro hac vice* forthcoming)
Colleen Roh Sinzdak (*Pro hac vice* forthcoming)
William E. Havemann (*Pro hac vice* forthcoming)
1101 New York Avenue, NW
Washington D.C. 20005
Telephone: 202.835.7500
Facsimile: 202.263.7586

Grant R. Mainland (*Pro hac vice* forthcoming)
Katherine Kelly Fell (*Pro hac vice* forthcoming)
Matthew J. Laroche (*Pro hac vice* forthcoming)
Andrew L. Porter (*Pro hac vice* forthcoming)
Nicole D. Valente (*Pro hac vice* forthcoming)
55 Hudson Yards
New York, NY 10001-2163
Telephone: 212.530.5000
Facsimile: 212.530.5219

*Attorneys for Defendants Kalshi Inc. and KalshiEX
LLC*